Margaret R. McDOUGLE and Leonidas I. McDougle, Appellees,

v.

WOODWARD & LOTHROP, INC., and Charles of the Ritz, Appellants.

No. 8668.

United States Court of Appeals Fourth Circuit.

Argued Nov. 6, 1962.

Decided Jan. 4, 1963.

Jacob S. Levin, Silver Springs, Md., for appellants.

Stanley B. Frosh, Washington, D. C. (Renah F. Camalier, Washington, D. C., on brief), for appellees.

Before SOPER and J. SPENCER BELL, Circuit Judges, and BUTZNER, District Judge.

J. SPENCER BELL, Circuit Judge.

This is an appeal from a judgment of the District Court for the District of Maryland based upon a jury verdict for the plaintiffs, Mr. and Mrs. McDougle, against the defendants, Charles of the Ritz and Woodward and Lothrop, Inc. The plaintiffs contend that a permanent wave administered to Mrs. McDougle by the defendant Charles of the Ritz had resulted in injury.

Mrs. McDougle had been a regular customer of the defendant for several years when, on September 6, 1958, she received a permanent wave administered by the defendant Charles of the Ritz. During the treatment some of the solution applied to her hair was felt running down the back of her neck. Irritation on her scalp, ears, and neck occurred shortly thereafter. When she returned to the shop two weeks later to have her regular shampoo, she called the condition to the attention of her operator. The operator used a small brush in the process of shampooing her hair, and thereafter the inflammation intensified and spread to other parts of her body.

On October 8th Mrs. McDougle, at the request of defendant's manager, consulted a dermatologist, who diagnosed her condition as contact dermatitis with possible secondary infection and an "id" reaction on the arms and legs. On October 9th Mrs. McDougle fell and broke her arm and was taken to a hospital. There her skin disorders became severe. The dermatologist was again called in and he ultimately diagnosed her then condition as dermatitis herpetiformis. Both parties offered medical testimony in the case. The plaintiff offered the testimony of her dermatologist, who was the treating physician. He testified that the contact dermatitis was in his opinion caused by the permanent wave and subsequent shampooing which she had received. As to the cause of the dermatitis herpetiformis which developed after her fall, he testified that medical authorities were far from agreeing as to its cause. Many authorities felt that it developed from causes which were internal in nature, but that "From my training * * * and from my reading, I have a feeling within me that nervous tension, nervous shock, certainly does have something to do with the production of this disorder". He testified that he felt that the whole train of events was brought about by the original cause—the permanent wave and subsequent treatment received at the beauty parlor.

The defendant offered an expert who first saw Mrs. McDougle about a year after her release from the hospital, and who testified from his examinations and her hospital record. He testified that in his opinion she had had dermatitis herpetiformis from the beginning and that the causes of this disease were unknown to the medical profession, but that he considered its cause related to internal conditions and in his opinion it could not have been caused by the permanent wave or shampoo, nor could it have grown out of or developed from contact dermatitis. He conceded that some authorities attributed its cause to nervous tension or strain, but he himself was not willing to accept this theory as applicable in the instant case because of his past experience and because of his opinion that Mrs. McDougle suffered from dermatitis herpetiformis from the beginning. Both parties agreed that the treatment received by Mrs. McDougle in the defendant's shop was exclusively under the control of the defendant Charles of the Ritz, and that the solutions used were manufactured by it.

The defendant raises three questions on this appeal: first, was there sufficient evidence of probable cause; second, was a basis for cause sufficiently shown so as to permit the application of the doctrine of *res ipsa loquitur*, and was the jury properly instructed thereon; and third, did the court err in not discharging the jury after they reported three times that they could not reach a verdict?

The crux of this case is the question of whether or not there was sufficient evidence offered on the issue of probable cause to take the case to the jury, and while the question is not wholly without doubt, we have reached the conclusion that the evidence offered was sufficient. The testimony of the two physicians differed. The plaintiff's treating physician, who examined her first about one month after she received the permanent wave, stated unequivocally that in his opinion she then had contact dermatitis and that its probable cause was the treatment giv-

-en by the defendant, Charles of the Ritz. From a careful reading of the testimony we understand that both specialists were agreed that contact dermatitis does not directly develop into or bring on the more virulent disease of dermatitis herpetiformis in the medical sense. However, Dr. Willetts, the treating physician, testified that he felt that the intense nervous strain which the patient underwent as a result of the itching and burning of the first disease, combined with her fall, was the cause for the development of the later disease. He conceded that it may have been the shock of the fall which triggered the outbreak of the later disease, but he felt that the "primary thing", the permanent wave, had set in motion a chain of events which ultimately caused the more serious form of dermatitis.

The defendant's expert, who readily conceded the qualifications of plaintiff's physician, examined the patient over a year after she was released from the hospital. He stated as his opinion that the patient had dermatitis herpetiformis from the beginning and that the treating physician was in error in his diagnosis. He testified that the authorities were unsure of the cause of this disease, but that most of them attributed it to internal causes. He did not completely reject the theory of plaintiff's physician as a medically reasonable hypothesis. He conceded that some authorities agreed to the possibility that tension and nervous strain might bring on the disease, but would not accept this hypothesis in the case at bar because of his past experience and because he had diagnosed the earlier symptoms as manifestations of dermatitis herpetiformis. Thus the two experts were not altogether at variance on the plaintiff's physician's theory of the cause of the later disease, but did differ as to their diagnosis of the earlier one. Under the circumstances the question of whether or not the cause of the later disease was a series of events set in motion by the defendant's negligent act was a question properly submitted to the jury upon the evidence of plaintiff's treating physi-

cian. While the witness conceded that many authorities held that nobody knew the cause or causes of dermatitis herpetiformis, even so, no authority in the field was prepared to reject categorically the theory that nervous tension or strain could bring on the disease and that in his opinion this was the cause in the plaintiff's case. The refusal of plaintiff's witness to rule out the possibility of other causes does not bring the case within those Maryland decisions which hold that the evidence must show probability—not mere possibility.

In Charlton Bros. Transp. Co., Inc. v. Garrettson, 188 Md. 85, 51 A.2d 642 (1947), the Court of Appeals of Maryland had under consideration a similar problem. There the plaintiff contended that the blow which he received in the accident produced a hernia. The evidence showed that the plaintiff had an old hernia at the time of the accident. The issue was whether it was the "old hernia" from which the plaintiff suffered or a new one caused by the accident. The court pointed out that whether it was possible to determine from observation by a physician whether the existing hernia was caused by the blow received in the accident was for the parties to develop on examination and cross-examination. The court went on to say: "The law requires proof of probable, not merely possible, facts, including causal relations. * * * But sequence of events, plus proof of *possible* causal relation, may amount to proof of *probable* causal relation, in the absence of evidence of any other equally probable cause." (Emphasis in original).

The defendant's contention that the doctrine of *res ipsa loquitur* does not apply to the circumstances of the case must also be rejected. There is no question but that the treatment was exclusively under the control of the defendant's operator, Miss Curtis, or that she used the defendant's proprietary solution. We have already shown that there was sufficient evidence to find that the cause of the injury was the treatment given by defendant's servant. As to the correct-

ness of the court's charge on the issue of *res ipsa loquitur*, we think the defendant has taken out of context the court's phrase "even though the exact *cause* of the plaintiff's injuries may be unknown". The court began that portion of its charge dealing with the *res ipsa loquitur* doctrine by explaining fully that the doctrine justified the jury in drawing an inference of negligence where no direct proof thereof was offered if, and only if, they found that certain facts existed. The court then summarized the portion of its charge dealing with this doctrine by explaining that it dealt with negligence. Subsequent to the part of the charge dealing with *res ipsa loquitur* the court told the jury no less than seven times that they would have to find that the defendant's negligence was the *cause* of the plaintiff's injuries and, at the request of the jurors, reviewed at length the two physicians' hypothesis of the case. We think the phrase complained of could not be construed as meaning other than "whether or not the jury could determine what the particular act of negligence was which caused the plaintiff's injuries". Any other interpretation would do injustice to the text of the charge as a whole.

■ Finally we are not convinced that the trial court abused its discretion in requiring the jury to continue their deliberations from about 11:30 in the morning until 5:50 that afternoon, in spite of the foreman's insistence that no verdict would be reached. This was the second trial of the case, each had taken about two days. The judge was extremely careful to explain to the minority that their judgment was not to be overborne by the majority. There is no suggestion of overbearing or partiality on the part of the court. The record indicates no attack upon the verdict as out of line once the issue of causation is conceded. This whole area is within the discretion of the trial judge, and we find nothing in the record which would induce us to disturb his decision.

Affirmed.